NOT DESIGNATED FOR PUBLICATION

No. 128,035

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of C.D., a Minor Child.

MEMORANDUM OPINION

Appeal from Saline District Court; JACOB PETERSON, judge. Submitted without oral argument. Opinion filed October 10, 2025. Affirmed.

*Katie J. Schroeder*, of Schroeder Law Office, LLC, of Beloit, for appellant natural mother.

*Nathan L. Dickey*, assistant county attorney, for appellee.

Before WARNER, C.J., MALONE and CLINE, JJ.

PER CURIAM: The appellant, whom we call Mother, challenges the district court's decision to terminate her parental rights involving her son, C.D. Mother argues that the evidence presented to the district court was not sufficient to support its findings that she was unfit to parent the child and that her unfitness was likely to continue for the foreseeable future. She also contests the district court's conclusion that termination was in the child's best interests. After carefully reviewing the record and the parties' arguments, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

C.D. was born in 2015. This case marks the third time in the last six years when C.D. has been placed in State protective custody as a result of Mother's conduct. Because

1

the issues giving rise to those previous cases are relevant to the district court's findings in the case before us, we detail them briefly here.

*The First CINC Case—2019*

In June 2019, the State filed a petition asserting that C.D. was a child in need of care (CINC) when C.D. was placed in police protective custody. The State alleged in its CINC petition that Mother was suffering from suicidal ideations and "'experiencing mania, aggressive behaviors, pressured speech and flight of ideas' as well as fighting with other patients [in a mental health facility], aggression, paranoia, and threats to harm others and herself." Mother worked on her case plan tasks over the next year, and C.D. was reintegrated with Mother in August 2020. By December 2020, this first CINC case was closed.

*The Second CINC Case—2021*

In July 2021, Mother was arrested for endangering a child and possession of methamphetamine, marijuana, paraphernalia, and hydrocodone. Shortly thereafter, Mother stated that she was unable to care for her son due to using drugs and voluntarily placed herself into drug treatment. The State filed a CINC petition, and C.D. was again placed in police protective custody. Mother worked on her case plan tasks, and C.D. was able to be reintegrated with Mother in February 2022; this second CINC case was closed several months later.

*The Current CINC Case—2023*

C.D. was seven years old when the State filed its CINC petition in the current case on July 10, 2023. The State alleged in the petition that "mother was found to be suffering from a mental health crisis in which she was delusional and unable to care for herself or her child." The petition further stated that Mother had been "taken to the behavioral

health unit and the child placed in police protective custody." On July 12, the district court issued a temporary order of custody, placing C.D. in the temporary custody of the Secretary of the Kansas Department for Children and Families (DCF).

On July 28, Mother had her first supervised visit with C.D. A social worker from the foster care agency, Saint Francis Ministries (SFM), reported that the visit went well; Mother was excited to see C.D., and she was appropriate and nurturing in their interactions. But on August 7, when Mother arrived for another visit, she began to yell at people outside the SFM office, rambling in a nonsensical way to SFM workers. A caseworker arrived with C.D. while this was all unfolding, and when the worker went to take C.D. back to the caseworker's car, Mother tried to hit the worker in the back of the head and made "derogatory comments about not wanting [C.D.] in front of him." C.D. was then "apologetic to staff for his mother's behavior."

On August 23, 2023, the district court found good cause to suspend visitations between Mother and C.D. for the time being and requested input from C.D.'s and Mother's therapists before resuming visits. The district court further ordered Mother to complete a new psychological evaluation.

On November 3, the district court filed a journal entry that found C.D. was a child in need of care based on the two reasons the State alleged in its petition—C.D. was without adequate parental care, control, or subsistence not due solely to the lack of financial means of the child's parents or other custodian, and was without the care or control necessary for the child's physical, mental, or emotional health. The court ordered that C.D. remain in custody of the Secretary.

From December 2023 through February 2024, C.D. and Mother had three family therapy sessions. But the family therapist expressed concern that after sessions, C.D. was showing signs of stress and anxiety, which began impacting his own individual therapy

3

sessions, as well as causing him to struggle at home and in school. One time, C.D. had a panic attack after a visit.

On February 8, 2024, the district court ordered "any visits between the mother and child to be therapeutic only." At the same time, the court ordered Mother to restart urinalysis testing.

C.D. and Mother had two more family therapy sessions in March 2024, and one session was cancelled "[d]ue to behaviors of [Mother]." Then on March 28, the district court issued an order ceasing family therapy, prohibiting Mother from having "either direct or indirect contact with the child," finding reintegration was no longer viable and "order[ing] the State to file a Motion to Terminate Parental Rights." C.D. was to remain in custody of DCF in out-of-home placement.

On April 23, 2024, the State filed its motion to terminate Mother's parental rights. Two days later, the district court ordered the permanency plan goal changed from reintegration to adoption.

A termination of parental rights hearing was held on July 19, 2024. At this evidentiary hearing, the State called five witnesses, and Mother testified on her own behalf.

The first two witnesses that the State called were Shawn Moreland and George Bradzionis, III, officers with the Salina Police Department, who responded to the scene of the call made by Mother's landlord (the event that triggered this CINC case). Moreland testified that he had many interactions with Mother. He had often offered her mental health services during these encounters, but Mother was "not typically receptive to anybody helping her." Moreland also testified that he had interacted with C.D. many times throughout these encounters with Mother, and that "[e]very time" C.D. tried to

make the situation better and calm things down. From Moreland's perspective, "it appeared as though [C.D.] was used to being the voice of reason in that house." Bradzionis testified that Mother was making statements about "[m]ouse engineers" and "[e]ating brains on a floor," accused Moreland and him of "trying to take her son to a field to eat him," and was speaking in an unfamiliar accent. In Bradzionis' "10 years of experience this was a very abnormal call." While Moreland took C.D. into police protective custody, Bradzionis transported Mother to Salina Regional Health Center for treatment.

The State next called Tamara Trepoy, a child protection specialist with DCF. Trepoy confirmed that this was the third CINC case opened for C.D. She testified that Mother also had a history of filing complaints against foster homes, alleging that there was physical, sexual, or emotional abuse occurring in the homes, but each report SFM found to be unsubstantiated. She also testified that when she picked C.D. up from his initial overnight stay to move him to a more permanent foster home, she asked, "How [are] you doing today, buddy?" C.D. looked at her and said, "I've had a rough life." But C.D. was excited to learn that he was going to the same foster home as he had been at during his prior CINC cases.

Next, the State called Lisa Modrow, formerly a permanency specialist with SFM. Modrow testified that her communication with Mother was "erratic in nature" although her communication began getting "more normal" from around March or April through June of 2024, at which point Modrow moved to a new job and stopped working on Mother's case. In the courtroom, Modrow played back four voicemails Mother sent her that were examples of Mother's erratic communication. Modrow testified that Mother called her many times one night, concerned that C.D. had been shot at Joel Olstein's church in Texas. But C.D. was in bed at his foster home placement at that time. Modrow also testified that visits between Mother and C.D. were often cancelled due to Mother's behavior, and no visits occurred after the end of March because of the no-contact order

5

entered by the district court once C.D. started showing outward symptoms of anxiety after visits.

Lastly, the State called Pam Bantam Cooper, psychological evaluator with SFM who completed Mother's initial psychological evaluation. Cooper testified that Mother had already been diagnosed with bipolar disorder and antisocial personality disorder, but she also diagnosed Mother with "other specified personality disorder with histrionic narcissistic and antisocial features." Cooper testified that Mother also suffered from anti-synosia, where the brain does not recognize the illness, so an individual does not recognize their symptoms or "realize that their thinking is illogical or that their delusions are false."

Cooper explained that these diagnoses could affect Mother's parenting of C.D. because they can make her erratic and can lead to Mother quickly "going into psychotic episodes." Thus, a "child would never know what to expect or wouldn't know what was true, when what they were observing isn't what their parent is telling them is happening." Cooper also testified that during a manic episode, a parent is unlikely to be very careful. Cooper explained that this was not just a generalization—there was a report in Mother's chart that when C.D. was an infant or young toddler, Mother left C.D. in an "exer-sauser [*sic*] for sixteen hours during a manic episode. And that he was stiff and couldn't hold his head up" when he was released.

Cooper noted that Mother reported she does not have manic episodes, even though there is documentation that she has been having manic episodes "for about twenty years."

Mother then testified on her own behalf. She stated that she completed all case plan tasks asked of her, including medication management—she would get her anti-depressant mood stabilizer injected every three weeks as prescribed; she had taken the requested UAs throughout her case—all of them negative except for one when she was

prescribed a pain medication for a back injury; she received both drug and alcohol evaluations as requested; she received mental health evaluations as requested—and followed their recommendations of therapy and medication management. With permission from the parties and the district court, Mother also read a letter that she wrote before the hearing, which expressed her love for C.D., how proud she is of him, and how much his presence in her life means to her.

At the close of evidence, C.D.'s guardian ad litem (GAL) argued that the State had met its burden of proving by clear and convincing evidence that Mother was unfit. But the GAL stated that she was "not convinced that a termination of parental rights is in [C.D.]'s best interest." The GAL noted there was uncontroverted testimony that C.D. "loves his mom, he worries about his mom, and when [Mother] is doing well and stable and their visits are good and they interact well, they are engaging with each other, they are happy to see each other." When visits ended on a bad note or were unexpectedly cancelled, C.D. would get anxious and worry about how Mother was. And that the two "clearly have a bond," and C.D. will tell anyone he meets how much he loves Mother.

The district court then asked the GAL what would likely happen to C.D.'s placement if it were to find Mother was unfit, but termination of Mother's parental rights was not in the best interests of C.D. The GAL answered, "truthfully, I don't know the answer to that. . . . I think [C.D.] remains in the system which is why I was not convinced that that's the right answer for [C.D.]." The GAL went on, "[b]ut what I do believe, is in his best interest, is being able to maintain . . . a relationship with [Mother]."

During this conversation, Modrow—the former permanency specialist with SFM who testified earlier in the hearing—indicated that she may have further insight into C.D.'s placement options. The district court allowed Modrow to return to the stand. Modrow testified that C.D. had mentioned to her many times that he would like an open adoption with his placement. The district court then inquired whether Modrow knew if

C.D.'s placement was interested in pursuing an open adoption. At that time, the person currently living with C.D., who was present in the courtroom, stated that she was an adoptive resource for C.D. and she would consent to an open adoption as long as Mother is "healthy."

After closing arguments, the district court entered its ruling on the State's termination motion. The court observed that Mother had put forth great effort to comply with the case tasks requested of her. But it also found that Mother "has suffered from very concerning mental health episodes" that have caused "erratic and bizarre behavior to the point that [the court was] concerned about [C.D.]'s safety." The court noted that reintegration had ultimately not been successful in the two prior CINC cases involving C.D. And Mother's involuntarily commitments to mental health facilities had had a marked effect on C.D. The court observed that Mother had been able to remain stable for up to nine months but then routinely suffered relapses. Given all those considerations, the district court found "that those cycles, that those mental health episodes, do meet the State's burden of showing that [Mother] is—is not able to care for the ongoing physical, mental and emotional needs" of C.D.

The district court next noted that "St. Francis Ministries has worked tirelessly, as has [Mother], at reintegration." It found "that the State has met [its] burden by clear and convincing evidence that—that reasonable efforts made by St. Francis and DCF have failed to rehabilitate. Based upon those efforts in this case, based upon the cases that have happened in the past as well."

The district court found that the State had proven by clear and convincing evidence that Mother was unfit to parent C.D. under K.S.A. 38-2269(b)(1) (mental health) and (b)(7) (failure of reasonable agency efforts to reintegrate). The court also found "based on that cyclical nature of the prior cases [and] this case" that Mother's unfitness was unlikely to change for the foreseeable future.

8

Lastly, the district court found that terminating Mother's parental rights would best serve "the physical, mental and emotional needs of C.D." It noted that the decision would provide C.D. with stability and consistency, while still offering the possibility of C.D. maintaining a relationship with Mother.

Based on these findings, the district court terminated Mother's parental rights. Mother appeals.

DISCUSSION

Parents have a constitutionally protected liberty interest in the relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). Thus, once a child has been adjudicated a child in need of care under K.S.A. 38-2202(d), before a district court may terminate a person's parental rights, our state's laws require a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the children's best interests. K.S.A. 38-2269(a), (g)(1).

Because a parent's rights regarding their child are fundamental, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). In doing so, this court must determine, after considering all the evidence in the light most favorable to the State, whether there was sufficient evidence to support the court's decision. In doing so, this court determines whether a rational factfinder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise reconsider disputed questions of fact. 286 Kan. at 705.

9

After finding a parent is unfit and that unfitness is likely to continue for the foreseeable future, the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). Because determining what is in a child's best interests inherently requires a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds its broad latitude if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

1. *There is sufficient evidence in the record to support the district court's finding that Mother was unfit to parent C.D.*

Mother argues that the evidence presented to the district court was not sufficient to support its findings that she was unfit to parent the child and that her unfitness was likely to continue for the foreseeable future.

*Present unfitness under K.S.A. 38-2269(b)(1) and (b)(7)*

As we have noted, before a district court terminates parental rights, it must first determine whether the parent is unfit—meaning, whether the parent engages in conduct or has a condition that renders them "unable to care properly for a child." K.S.A. 38-2269(a). When determining a person's fitness as a parent, the district court considers, among other things, the several factors listed in K.S.A. 38-2269(b) and (c). Depending on the facts and circumstances of each case, evidence of any one of these factors can be enough to support a finding of parental unfitness. K.S.A. 38-2269(f).

10

In this case, the district court found that the State met its burden to prove by clear and convincing evidence that Mother was unfit to parent C.D. at the time of the termination hearing under K.S.A. 38-2269(b)(1) and (b)(7):

- "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child," and

- "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

Mother first argues that there was insufficient evidence to support the district court's finding under K.S.A. 38-2269(b)(1) that she suffered from a mental illness of such duration or nature as to render her unable to care for the ongoing physical, mental, and emotional needs of C.D. Mother argues on appeal that although the district court heard some testimony to support its findings, the body of evidence showed that Mother's mental health was improving and she was following all of the recommendations of her mental health providers.

The district court acknowledged Mother's strides in its findings. But it also found that Mother's mental health continued to fluctuate greatly throughout the current CINC case, such that those cycles rendered Mother largely unable to care for the ongoing physical, mental, and emotional needs of C.D. There was evidence presented at the hearing to support these findings—Mother's communication was often erratic and that visits between Mother and C.D. were often cancelled due to this behavior, which was to such an extent that the district court entered a no-contact order in March of 2023, once C.D. started showing outward symptoms of anxiety after their visits. These fluctuations in Mother's mental health made it such that she could not even communicate in a healthy manner with C.D., which adversely affected her ability to care for C.D. There is

11

sufficient evidence to support the district court's finding that Mother was unfit at the time of the termination hearing under K.S.A. 38-2269(b)(1).

Mother also argues there was insufficient evidence to support the district court's finding under K.S.A. 38-2269(b)(7) that there had been a failure to rehabilitate the family despite the caseworkers' efforts. She argues that despite her progress in her mental health treatment and a period of stability from April to June 2024, she was not permitted to see her child, even in a therapeutic or supervised setting, and the no-contact order "thwarted Mother's ability to show St. Francis and the court her parenting capabilities."

But there was evidence presented at the hearing that told a different story. Mother had visits with C.D. where she was able to show her parenting skills, but at one visit in August 2023, when Mother arrived she began to yell at people outside the SFM office, rambling in a nonsensical way. When a caseworker went to put C.D. in the car so he did not have to see Mother acting in this way, Mother tried to hit the caseworker in the back of the head. Mother's visits with C.D. moved to only therapeutic visits after that instance. And while some of the therapeutic visits went well, many were cancelled because of Mother's erratic behavior. Ultimately, these therapeutic visits were canceled when C.D. started showing signs of stress and anxiety that caused him to struggle at home and in school, including one instance when C.D. suffered a panic attack. There is sufficient evidence to support the district court's finding that Mother was unfit at the time of the termination hearing under K.S.A. 38-2269(b)(7).

*Likelihood to continue for the foreseeable future*

Mother next challenges the district court's finding that her unfitness was likely to continue for the foreseeable future. She argues that in making that finding, the district court relied too heavily on the two earlier CINC cases, despite Mother's progress in her

12

mental health treatment and a period of stability for the few months immediately preceding the termination hearing.

A court evaluates the "foreseeable future" from a child's perspective. *In re R.S.*, 50 Kan. App. 2d at 1117. This is because children perceive time differently—for a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4). In evaluating this time frame, a court can look to a parent's past pattern of conduct as one indication of how the parent will conduct themselves in the foreseeable future. 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

We find there was evidence to support the district court's finding that "based on that cyclical nature of the prior cases, in this case," Mother's unfitness was unlikely to change in the future. There was testimony at the hearing that Mother had been experiencing manic episodes for around 20 years. Both earlier CINC cases started when Mother was suffering a mental health crisis, ended in reunification because she was doing better and completing her case plan tasks, and then resulted in C.D. being removed from her custody again when Mother's mental health declined. Thus, the district court was right to look to the prior two CINC cases for insight into Mother's progress on this case and determine that there was nothing unique in this present case that indicated the cycle of highs and lows would end here.

Children have a right to permanency within a time frame reasonable to them. *In re B.H.*, 64 Kan. App. 2d 480, Syl. ¶ 4, 550 P.3d 1274 (2024). When the current CINC case began, C.D. was only seven years old and had been removed from Mother's care three times in four years. The current case showed signs that this cycle was likely to continue without an external and permanent change. The district court did not err when it found that the State proved by clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future.

13

2. *The district court did not abuse its discretion by finding that terminating Mother's parental rights was in C.D.'s best interests.*

The last argument Mother raises on appeal challenges the district court's finding that terminating her parental rights was in the best interests of C.D. Mother argues that "the court failed to consider the nature and strength of the relationships between the child and Mother and the emotional trauma that would be caused to the child by termination of the parental rights."

Our review of the record demonstrates the reasonableness of the district court's best-interests determination. The district court acknowledged the strong relationship and love between Mother and C.D., stating "it's also apparent that she cares deeply about her son and that's really undeniable."

Rightly refocusing on what is in the best interests of C.D., the district court thoughtfully weighed the impact of terminating Mother's rights on C.D. with the impact of C.D. constantly worrying when he may be plucked out of his daily life and placed back in foster care. In doing so, the district court reached the conclusion that the physical, mental, and emotional needs of C.D. would be best served by termination. While a different judge may have come out the other way in that balance, we cannot say this difficult decision was unreasonable based on the record presented.

In light of the evidence presented at the hearing, the district court did not err when it terminated Mother's parental rights.

Affirmed.